[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Helen C. Roman brings this action, claiming to be the owner of a certain piece and parcel of land located in the town of Ellington, bounded and described in a certain Quit Claim deed from the town of Ellington, recorded in the land records of said town in Volume 68, p. 683, attached hereto, as exhibit A, in this memorandum of decision. The said deed was executed on December 18, 1963, recorded on December 30, 1983. The scope of the land is described as "Containing fifty-one acres, more or less." The legal description of the property is as follows:
 "Bounded on the North by land of Eastern Conn. Realty Company; on the East by land now or formerly of the Estate of William E. Desso; on the South by the Ellington-Tolland Town Line, which is along land of the Connecticut Yankee Girl Scout Council, Incorporated; and on the West by land of the State of Connecticut
Containing Fifty-one (51) acres, more or less."
The last of the briefs requested by the court was filed on June 8, 1998. CT Page 10571
This action is brought against John E. Julian, Trustee of the Terra Alta Trust, and against John J. Julian, an individual. The complaint, as filed, is in seven counts, to wit:
First — Quite Title
Second — Slander of Title
Third — Slander of Title Without Malice
Fourth — Trespass
Fifth — Intentional Infliction of Emotional Distress
Sixth — Fraud
Seventh — Abuse of Process.
The plaintiff thereafter amended the complaint to add an eighth count, claiming Adverse Possession.
The defendants counterclaims, seeking to quiet title in the defendants, and such equitable relief as is appropriate, including that the plaintiff correct the land records to remove the plaintiff's cloud of the defendant's title. The defendant also seeks to have a 1903 deed, giving its predecessor title to adjacent land, reformed. The defendants further claim title by adverse possession. The defendants also claim, alternatively, an easement by prescription.
 I
The court finds the following facts. The property in dispute is located in the town of Ellington. It is in the shape of a parallegram, nearly a rectangle, whose southerly boundary is the town line of the town of Tolland. The north and south boundaries of the property are the shorter of the lines, and the east and west boundaries are the longer of the lines. It consists of approximately 51 acres, although in older descriptions it is described as 62 acres. For ease of reference it will be described herein as the 51 acre parcel.
This property was previously owned by Mineral Springs Manufacturing Company, who acquired title thereto by deed from one Charles Fox on or about February 1, 1882. The deed was CT Page 10572 mistakenly recorded on the land records of the town of Stafford, rather than on the land records of the town of Ellington.
The property is wooded and does not border upon a public road or highway.
The property owned by the defendant lies immediately north of and adjacent to the property in dispute. The defendant's property, approximately 309 acres, is located partly in the town of Ellington and partly in the town of Stafford.
The defendant Terra Alta, Inc's property was conveyed by the Mineral Springs manufacturing Company to one John C. Lott by deed of December 29, 1903. The defendant's property is located part in the town of Stafford and part in the town of Ellington and contains "309 acres". The northerly portion, located in Stafford contains approximately 218 acres and the southerly parts, located in Ellington contains approximately 85 acres — (See defendant's exhibit A).
The southerly portion of the defendant's 309 acres abuts the property in question along the entire length of the defendant's southern border. The property in question abuts the defendant's property along the entire length of its north border.
The Mineral Springs Manufacturing Company was a corporation, so described in its deed of the 309 acres which conveyed that property to the defendant's predecessors. See exhibit H, describing Mineral Springs Manufacturing Company as "a body politic and corporate". The deed is signed by William Lee, President and Louis S. Converse, Secretary. It recites the fact of "a resolution adopted the twenty ninth day of September 1902 by the stockholders and directors of such company . . .".
The chain of title clearly reveals that the Company transferred the 309 acre parcel to the defendant's predecessors. However, there is no evidence to indicate that the Company ever transferred the 51 acre property in dispute to anyone. This property, the 51 acre parcel, described variously as 51 acres, or 62 acres, or 60 acres, or 56 acres (see exhibit AA) was never transferred from the corporation.
The office of the Secretary of State of the State of Connecticut has no record of a corporation Mineral Springs Manufacturing Company. Even if it had been a foreign corporation CT Page 10573 it would have been required to register with the Secretary of State. See General Statutes § 33-920 and predecessors. However, it is described in the deed of the 309 acres, exhibit H, as "a body polotic and corporate by the laws of the State ofConnecticut." Hence it is proper to conclude that it was a Connecticut corporation.
Connecticut General Statutes § 33-387 (Revision 1958) provided for dissolution by forfeiture if a corporation failed to file an annual report during the two year period following its date of certification if incorporation. Although this provision has been changed by Public Act 95-252, it would appear that this corporation would have been dissolved by forfeiture when it ceased to do business in the early part of this century. No claim is being made that this corporation is still in existence, or was in existence at the time when the plaintiff first obtained a deed to this 51 acre property in 1963, or at any time remotely proximate thereto.
The plaintiff obtained a quit claim deed to this 51 acre property from the town of Ellington on December 18, 1963, recorded in the land records of the town of Ellington December 30, 1963, Vol. 68, p. 683.
The defendant thereafter, in 1996, obtained a quit claim deed to this property from parties purporting to be the now living descendants of their grandfather William Lee, who is designated on the 1903 deed to the defendant's predecessor to the 309 acres, as president of Mineral Springs Manufacturing Company.
The affidavit of William D. Lee, (defendant exhibit 9) states that the grandfather was the president of the company; that the company ceased operations "sometime before 1929" and that "the 60 acre parcel was never conveyed."
The affidavit states "the following individuals are the only heirs of William Lee: Lee C. Hallam; William J. Hallam; Ralph G. Lee; Marilyn L. Lee; William D. Lee." The Probate Court records for the district of Stafford lists as heirs at law of William Lee: Eugenia Drulz; Ralph Lee; Marion Lee; Jesse Lee. The devisees of the residuary estate are Ralph Lee and Marion Lee, and additionally Howard Lee, Arthur Lee, Hattie Lee Hallam.
The inventory of the William Lee estate contains no mention of the 51 acre parcel now in dispute, although other real estate CT Page 10574 is listed in the inventory. The inventory contains no listing of or mention of any stock in Mineral Springs Manufacturing Company, although other stock is specifically inventoried.
The quit claim deed which the defendant obtained on January 23, 1996 is signed by each of the persons who are claimed by William D. Lee to be the heirs of his grandfather. This deed was recorded by the defendant in the Ellington Land Records on March 28, 1996 Vol. 222, p. 814.
 II The Claims of Title
A. The plaintiff claims title to the property by virtue of the quit claim deed from the town of Ellington, December 18, 1963. The subject of this property came to the attention of the plaintiff's husband during a discussion with the assessor of the town of Ellington, who told him that no one owned the land and hence he could claim that land.
The plaintiff, represented by Atty. Gnutti, and the town of Ellington, represented by its Attorney King, agreed that the town of Ellington would quit claim the 51 acre property to the plaintiff. A notice of special town meeting was duly published. Included in the notice was the agenda listing #5. "To consider and if it deemed advisable to empower the Board of Selectmen to grant by quit claim deed all right title and interest . . . ", which property was described as bounded by listed abutting owners. The notice was dated October 24, 1963. The potential grantee was not identified by name. A defendant's predecessor was listed as the north abutting owner. (See Plaintiff's exhibit 4).
Following the town meeting the quit claim deed was executed by the town of Ellington, acting by its Board of Selectmen, Pritchard, Fluckinger and Aubrey. The deed was executed December 18, 1963, recorded in Vol. 68, p. 683 of the Ellington Land Records on December 30, 1963. The consideration for the deed is described as "for the consideration of one or more dollars, being less than one hundred (100) dollars."
The land records contain no indication whatsoever that the Town of Ellington ever acquired title to this property from any source whatsoever. The deed does not purport to recite a predecessor in title, or a source of the town's title, as is CT Page 10575 often the custom in the granting of deeds. There is no indication that the property was purchased by the town upon any sale or levy of a tax warrant, as provided in General Statutes §§ 12-155;12-157; 12-158; 12-159; or was otherwise purchased by or conveyed to the town. There is no evidence that the property was acquired by the town under a foreclosure of a tax lien under the provisions of General Statutes § 12-181 et sec. There is no rule of law in this state to indicate that abandoned real estate becomes the property of a town, through escheat or any similar or allied proposition of law.
When the town of Ellington executed the quit claim deed to the plaintiff it had nothing to give. It had no right, title, and interest in the property. It quit claimed nothing for it had nothing to transfer. Had this deed been furnished prior to forty years ago (40 years prior to the commencing of this action) the plaintiff might have acquired marketable legal title after 40 years by operation of law. General Statutes § 47-33c. But that did not occur.
The court determines that the plaintiff does not heretofore have record title to this property.
B. The defendant claims to have record title to this property by a quit claim deed of William D. Lee, et al, January 23, 1996, recorded in the Ellington Land Records on March 28, 1996 in Vol. 222, pp. 814-817.
This deed purports to be a deed of "The Mineral Springs Manufacturing Company, acting by the sole heirs at law of William Lee, President and Owner of said Mineral Springs Manufacturing Company."
This "deed" is patently ineffectual for a myriad of reasons. First, there is no corporate authorization for anyone to sell the assets of the corporation, nor is any such authorization claimed. Second, there is no distribution of the stock of this company from the estate of the president, William Lee. There is no indication that he owned any of the stock at the time of his death. Further, if he did own any of the stock at that time there is no indication that he was the sole stockholder of the entirety of the corporate stock. To the contrary, the 1903 deed of the 309 acres, recites the authority for that deed as a "resolution adopted by the stockholders", (plural) indicating more than one stockholder. Stock in this corporation is neither described in CT Page 10576 his will nor does it appear in the inventory of the estate. (See defendant's exhibit H.H.). Nor are the residuary legatees the same persons as are listed as his heirs at law or next of kin. This real estate is not inventoried as part of his estate, nor is there any indication that the real estate was ever transferred to William Lee, President, from the corporation. There is not and cannot be a claim that property is transferred to corporateofficers upon a ceasing of business.
There is no indication that the persons who signed this quit claim deed, on January 23, 1996 through February 15, 1996, held a belief, prior to being contacted by the defendant, that they or any of them knew of the existence of this property, let alone harbored a belief that they had any right, title or interest in and to this property. This will be discussed in further detail in subsequent sections of this decision.
The court determines that the defendants have no record title in and to this property. Because the persons from whom the defendant obtained this quit claim deed had no title to this property, the defendant has no title to this property.
The record title to this property remains in Mineral Springs Manufacturing Company, a defunct corporation which has no present legal or de facto existence. Dissolution of a corporation does not transfer title to the corporation's property. General statutes § 33-884(b)(1). This may be subject to a possible exception where the stockholders continue to operate the corporation's business. Haddad v. Francis, 13 Conn. App. 324. That is not the case here.
Where a party, pursuant, to General Statutes § 47-31
seeks to quite title, the trial court should first determine in which party record title lies and then determine whether adverse possession has divested the record owner of title. See Clark v.Drska, 1 Conn. App. 481, 488 (1989). The court determines that neither the plaintiff nor the defendants have record title to this land.
 III
The plaintiff's claims against the defendant.
A. Second Count — Slander of Title.
CT Page 10577
The plaintiff has no valid record title to the property. The source of his claimed title, the quit claim deed from the town, conveyed no title. Hence the plaintiff has no title to be slandered. The mere fact that someone else may claim title to such property does not constitute slander of a non-existent title.
B. Third Count — Slander of Title Without Malice.
The same principles apply as are applicable to the second count. There is no slander of title.
C. Fourth Count — Trespass.
The defendant, prior to having searched the title and then having properly determined that the plaintiff did not have record title to the land, obviously could not be held to be possessed of actual knowledge that the plaintiff had title to the land. The court determines that the defendant was personally unaware of the extent of the plaintiff's overt acts which could eventually be determined to constitute acts of such scope as to result in a judicial decision of title through adverse possession. The wooded forest type premises could well have appeared to the defendant to be abandoned property, without clear or vivid indications of habitation or active use, which may well have appeared to have been abandoned and hence capable of being used casually and passively by anyone, as members of the public. See Ventres v.Farmington, 192 Conn. 663, 668 (1984). No acts of intrusion are proven to have taken place subsequent to the commencing of this litigation between the parties. The activity of the parties will be described in further detail in subsequent sections of this decision. The acts of the defendant did not constitute legally actionable trespass.
D. Fifth Count — Intentional Inflection of Emotional Distress.
One who has no proper record legal title to property, and whose claim rests upon adverse possession, must expect that eventually he will be called upon to defend his right to possession through judicial proceedings. This is particularly true when adjacent or nearby property owners, who have made some passive use of the property over the years, also claim a right to possession and use of the property. The mere fact of the inevitable distress of litigation to settle title to said property under these circumstances cannot be said to constitute CT Page 10578 intentional infliction of emotional distress. The defendants had sufficient reason to attempt to obtain legal title to what appeared to them to be abandoned land, and to seek a determination of title in the defendant through the defendant's claim of adverse possession, and/or to the right to an easement by prescription.
E. Sixth Count — Fraud.
There is no evidence that the defendant made any representations of fact to the third persons, the purported heirs of the grandfather William Lee. The affidavit of William Lee, heir, recites facts known to William D. Lee from family history, such as the year of death of the grandfather, his presidency of the corporation, and the ceasing of operation of the corporation. The remaining matters, such as the real estate transfers, or the absence thereof, are matters set forth in land records.
The quit claim deed executed by the purported heirs make no warranty, which is the same absence of warranty as is the nature of a quit claim deed from the town to the plaintiff. There is no evidence that the defendant told the purported heirs that they were in fact the owners of the property. The quit claim deed says nothing more than whatever we have, if anything, we give to you.
The plaintiff cannot prevail on this fraud count.
F. Seventh Count — Abuse of Process.
The plaintiff does not indicate how the placing of a claim upon the land records is akin to "process". Process refers to legal "process" whereby the power and jurisdiction of a competent judicial authority compels and brings a party to the jurisdiction of the court. It is effectuated through officers of the courtacting in that capacity, namely a judge, a commissioner of the superior court or the clerk of the court. See General Statutes § 52-45a. The filing of documents on the land records is not "process".
 III The pre-litigation status of legal title as reflected in the land records
Although the original deed from Charles Fox to Mineral CT Page 10579 Springs Manufacturing Company, dated February 1, 1882 was inadvertently not recorded in the land records of the town of Ellington, the deed has since been recorded in that town. The recording took place on March 28, 1996 by the defendant filing that deed in connection with and as a prerequisite to his filing of the quit claim deed from "the heirs of William Lee." It appears that the deed had originally been recorded, by mistake, in the town of Stafford, on February 2, 1882. (See defendant's exhibit G). Hence when this action was commenced by service of process on April 7, 1997 the chain of title in the land records of the town of Ellington would have then clearly demonstrated legal title coming from Charles Fox to Mineral Springs Manufacturing Company on February 1, 1882. The fact of late recording of that deed is of no significance as concerns the issues presented by this litigation. Hence the land records in the town of Ellington, prior to the ineffectual "deed" from the heirs of William Lee, clearly reflected bare legal title in Mineral Springs Manufacturing Company.
 IV The defendant's claim for reformation of deeds.
The defendant claims that when Mineral Springs Manufacturing Company conveyed the 309 acre parcel to the defendant's predecessor in 1903 it intended to also convey to the said predecessor the 51 acre parcel in dispute. There is no evidence to support that contention.
A review of the 1903 deed conveying the 309 acres, defendant's exhibit H clearly demonstrates that the description of the conveyed property is a detailed description articulating the bounds in precise rods and links, with accompanying precise compass angles, and utilizing physical monuments. It accurately describes that portion lying in Stafford and Ellington in terms of acreage, which for each piece is accurate to ± 3 acres. Had there been any interest on the part of either party to that conveyance to purchase or to sell, to convey or receive, the abutting 51 acre parcel it is obvious that this would have been clear to the parties, upon a casual reading of the description. The 51 acre parcel was not included in this conveyance, and that if there had been an error of and as large as 51 acres it would certainly have been apparent, and rectified.
Further, it is not logical to infer that merely because CT Page 10580 parties determine to sell or buy a certain parcel of land they would be desirous of buying or selling other adjacent property. Reasons for purchasing and selling property are multitude.
The court determines that the defendant has not demonstrated that the absence of a conveyance of this large parcel of 51 acres
was a matter of mutual mistake. Reformation of the deed is not appropriate.
 V Laches, Estoppel, Unclean Hands. Statute of Limitations
There is no evidence to support the defendant's special defense of laches. The plaintiff brought this action within a year after the defendant filed the purported quit claim deed on the Ellington land records. As to estoppel there is no evidence to indicate that the plaintiff knew that the town of Ellington did not have legal title to the land which was conveyed to the plaintiff. The plaintiff, as a layman, was entitled to rely upon the information given to Mr. Roman by the tax assessor, that the property was abandoned, and to rely upon the belief by his counsel, and counsel for the town of Ellington, that the town had the right to convey the property. This also applies to the claim of "Unclean Hands". The plaintiff did not even know that anyone else was claiming a right to the land until the tax assessor called to inquire because, unknown to the plaintiff the defendants had filed the 1996 "deed".
The defendant does not explain how it claims that a six year statute of limitations pertains to this action. General Statutes § 52-576 pertains to "Action for account or on simple or implied contracts." No such contracts, or accounting, are claimed by the plaintiff in this action.
 VI Action, and counterclaim, to Quiet Title based on Adverse Possession.
The plaintiff originally brought this action to quite title based upon a claim and belief that she had acquired good title by virtue of the deed from the town of Ellington. She was allowed to amend the complaint to claim adverse possession. CT Page 10581
The defendants, in their answer to the complaint, themselves counterclaim to quiet title, claiming adverse possession.
As is stated heretofore this court has determined that neither party has record legal title to this property.
Action to quiet title based upon adverse possession are rooted in three statutes.
 1. Section 52-575 reads as follows: "Entry upon land to be made within fifteen years.
(A) No person shall make entry into any lands or tenements but within fifteen years next after his right or title to the same first descends or accrues or within fifteen years next after such person or persons have been ousted from possession of such land or tenements; and every person, not entering as aforesaid and his heirs, shall be utterly disabled to make such entry afterwards. . . ".
 2. Section 47-21 reads as follows: "Deeds of land by persons ousted of possession, void.
Any conveyance or lease, for any term, of any building, land or tenement, of which the grantor or lessor is ousted by the entry and possession of another, unless made to the person in actual possession, shall be void."
 3. Section 47-31 reads as follows: "Action to settle title or claim interest in real or personal property. (a) An action may be brought by any person claiming title to, or any interest in, real or personal property, or both, against any person who may claim to own the property, or any part of it, or to have any estate in it, either in fee, for years, for life or in reversion or remainder, or to have any interest in the property, or any lien or encumbrance on it, adverse to the plaintiff, or against any person in whom the land records disclose any interest, lien, claim or title conflicting with the plaintiff's claim, title or interest, for the purpose of determining such adverse estate, interest or claim, and to clear up all doubts and disputes and to quiet and settle the title to the property. Such action may be brought whether or not the plaintiff is entitled to the immediate or exclusive possession of the property."
General Statutes § 52-575 is rooted in the common law requisite of seisin. The necessity of seisin is as ancient as is CT Page 10582 the English Common Law concept of private ownership of land. The term seisin means to literally sit upon the land, and is derivative of the Norman-French word "assiss" which means to sit, and was ceremoniously accomplished by livery of seisin. Not only was the act of sitting required to obtain seisin but continued sitting was required to maintain seisin.
(See Preliminary Survey of the Law of Real Property; C.J. Moynihan, Ch. 3, p. 41).
The concept of seisin may philosophically have its origin in the theological concept that land exists for the use of people, and that man shall place and maintain his productive hand upon the land. It is most practically based upon the historical practical reality that productive land is a source of revenue for the sovereign, or the feudal grantor. This proposition is best exemplified by the ancient statute de Mortmain, prohibiting devises to eclastical societies, by "frankelmoin", which required only ecclesiastical services, and which statute was enacted to preclude a "dead hand" from descending upon the land. Moynihan,
supra, p. 6, p. 101. A multitude of common law enactments and judicial determinations exist to effectuate the goal of free alienation to promote actual use of land, including the Rule Against Perpetuities, the Rule in Shelly's Case, the Statute of Uses, and the Statute de Mortmain.
Although the activity which constitutes seisin, (possession), has become far more liberal throughout the centuries, yet the statutory form of warranty deed (General Statutes § 47-36c) carries with it the "meaning and effect of the following words: The grantor covenants with the grantee that he is well seized in fee simple of the greatest premises. . . . " Such a covenant gives assurance to the grantee that, in addition to obtaining legal title to the land, he will receive the right to full enjoyment of the land, and particularly the right to possess the land consistent with the full indica of title in fee simple absolute. Stated otherwise, the covenant of seisin warrants that the grantor has obtained and retained possession of the land.
There is no indication that the town of Ellington ever claimed that it had ever in any fashion possessed this land. Hence there can be no claim that the plaintiff's possession can be tacked onto any status of adverse possession of the town. The claim of adverse possession of the plaintiff must be based solely on the plaintiff's possession of the land. CT Page 10583
There is no claim asserted by the defendant that the heirs of William Lee ever possessed this land in any fashion, or that the defendants tacked their claim of possession onto a possession by those heirs. Even if it could be argued that the heirs of Lee obtained legal title by devise or descent, yet their having failed to make any entry into the land within fifteen years after any theoretical distribution to them, caused them to be "utterly disabled from making such entry afterwards." General Statutes § 52-575. Having made no entry, no seisin in any sense of that term, they would be utterly disabled to convey a right to enter to these defendants or to anyone else. Further, a deed which may have been given by them to the defendants after ouster by entry and possession of another, here claimed by the plaintiff, would be null and void (General Statutes § 47-21) and hence would be subject to be ordered removed from the purported claim or chain of title on the land records. If they could claim descent in their own right, and had the heirs of Lee made entry within the fifteen years grace period, they may have prevented the running of adverse possession against them by relatively simple acts, possible as rudimentary as a payment of taxes and the like. But there is no evidence and no claim that they or any of them did so. This is understandable as there is no evidence that they even knew about the existence of the 51 acre parcel. The heirs of Lee had no legal title, but even if they did it would not prevail against a successful claim of adverse possession in the face of their non "entry" within 15 years of any possible claim of their having obtained title earlier in this century. CGS § 52-575 and CGS § 47-21.
 VII Adverse Possession against Mineral Springs Manufacturing Company
The factual scenario presented by the circumstances of this case present a somewhat different circumstance than is presented by most adverse possession cases. Generally these cases arise from claims of adverse possession against a living or viable person, natural or corporate. Here the title to the land lies with a defunct corporation, Mineral Springs Manufacturing Company. It is assumed, there being no evidence to the contrary, that the Corporation had initially accomplished seisin of the property in 1882, which seisin ostensibly theoretically continues until and unless it is disseised by, (ousted by) the entry and CT Page 10584 possession of another. CGS § 52-575; § 47-21.
The plaintiff claims that she took possession of this property upon receiving the quit claim deed from the town of Ellington in 1963. If so ousted, any right to give a valid deed by Mineral Springs Manufacturing Company would have expired by 1979. (CGS § 52-575; CGS § 47-21).
 A. The Plaintiff's Claim of Adverse Possession
The court finds the following facts, from the evidence. The plaintiff's husband, acting on her behalf, walked the property and located stone boundaries on the property. He put up barbed wire on the northern boundary in 1967. Although it was a single strand of wire which had deteriorated over the last 35 years it served the purpose of alerting others that this was the plaintiff's property. He also put up cardboard type no trespassing signs on the boundaries, and surveying type ribbons. The cardboard has deteriorated which is to be expected over this period of time. The plaintiff subsequently purchased land on the east side of and abutting the east boundary of the 51 acre piece to enlarge her holding. The plaintiff subsequently acquired an easement for access and egress, from a utility company, so as to give proper legal access to the 51 acre piece from a paved road. The plaintiff hired a surveyor to verify the south boundary to be certain of the precise physical location of the south boundary, which abuts the land of others — (not the border with the defendant, as that border appeared to the plaintiff to be clearly identified).
Mr. Roman had conferences with the State of Connecticut and with the Yankee Girl Scouts to amicably be certain that these parties, abutters, were in agreement with the physical location of the precise common boundaries with these abutting owners. He sought advice from the State of Connecticut Forrester as to the prospect of logging on the 51 acre parcel. He consulted with a private Forrester, a logging company, about the prospect of that company logging the property. (The property could not be logged because of inadequate logging vehicle access).
The Roman family (wife, husband and children) used the property on a frequent basis for recreational use, such as picnics and recreational walking. In the 1960's when the family was younger, this would occur two or three times per week in the summer. In the fall Mr. Roman and his sons would frequently hunt on the property during season. The family would use the property CT Page 10585 occasionally in the winter, for sledding type recreational activity. There is a well worn walking path providing foot access from the east property of the plaintiff verifying frequent use of the 51 acre property by the Romans. Miss Nichols, the state forester observed the walking path, and also the remnants of stone boundary line along the north boundary.
The property in question is a wooded area which is precisely suited to the uses to which it has been placed, by the Romans (wife, husband and children), that is, for recreational purposes. In addition to their use of the property the Romans have from time to time given friends permission to hunt on the property, which permission is what would be sought from, and the granting of which would be an additional indication of a claim of exclusive right to use the land. Mr. Roman has been careful to not trespass or go upon the land of the defendant, which abuts to the north. The Romans are displeased when others may attempt to come on the property from the State property and/or the Scout property which abuts the 51 acre property, and discourages any such unwarranted intrusions. The cumulation of this activity is sufficient to demonstrate a claim of adverse possession. The plaintiff has paid the real estate taxes on this property to the town of Ellington each year, as so billed by the town of Ellington.
An honest belief in title, though not necessary, is of course evidence of a determination to exclusively possess.
 "The essential elements of an adverse possession sufficient to create title to the land in the claimant are that the owner shall be ousted of his possession and kept out uninterruptedly for a period of fifteen years, by an open, visible and exclusive possession by the claimant without license or consent of the owner and under a claim of right."
 Ruick v. Twankins, 171 Conn. 149, 155 (1996)
 "Color of title is not an element of adverse possession in the absence of a statutory requirement."
 Ruick v. Twankins,
Supra, p. 149
The principles were recently reaffirmed by our appeals court in Crandall v. Gould, 244 Conn. 583 (1998). Hence a "claim of CT Page 10586 right" does not require that the possessor have a good faith belief of having title or a legal right to occupy in the sense of title or tenancy. That proposition, though seemingly harsh, is understandable in the context of the common law priority that land be placed to some use and be not subject to a "dead hand", through non use and tax insulation.
Though color of title is not a requirement for adverse possession, yet an honest, through mistaken, belief in title, or legal right, emanating from a municipal deed is obviously strong evidence of the intent of the possessor to hold, retain and exclusively possess the land.
The payment of real estate taxes by the plaintiff for a period now of thirty-five years since the date the plaintiff received the quit claim deed to the land is of great significance.
 "They paid the taxes on this property, and that this is regarded in law as powerful evidence upon the question of ownership; . . .".
 Merwin v. Morris, et al, 71 Conn. 555, 575 (1899) (Emphasis added)
Where the nature of the land is such, as in the instant case, where it was realistically used and usable for passive recreational activity, such that permanent construction is not customarily expected, payment of taxes is obviously of great significance. It is human experience that persons do not pay taxes on land or property for which they knowingly have no possessory dominion, or the commensurate obligations attendant thereto.
 B. The Defendant's Claim of Adverse Possession
The defendant's claim to have acquired the property by adverse possession.
The defendant Terra Alta Trust is the legal owner of the 309 acre properties north of the subject property. One, Michael Julian acquired this property in November 1963 from Eastern Connecticut Realty Company. Between December 1976 and November 1980 the property was sold to unrelated third parties, a Mr. Pizza, Weingarten and Diviso. In November 1980 John Julian, trustee foreclosed. In 1981 John Julian, trustee, deeded the property to members of the Julian family. In November 1986 they deeded the property to Terra Alta Inc., one of two of the present defendants. The officers are members of the Julian family. CT Page 10587
Various members of the "extended" Julian family, uncles and the like, claim to have used the 51 acre parcel for many years; Edward since the 1920's, Leo since 1930; John since 1956; Michael for "almost 40 years". Their use was for the purposes of; "hunting"; "picking berries"; "gathering mushrooms". They claim to have never seen the Romans on the property.
The Julians live to the general north of the 309 acre parcel. Their access to the 51 acre parcel is through the 309 acre parcel. Hunting, berry picking and mushroom gathering on the 51 acre parcel requires merely a physical walking onto the 51 acre parcel, which drifting is consistent with the absence of a physical barrier between the 51 acre property and the 309 acre property. Standing by itself this carries with it none of the indicia of possession and control, which is the essence of adverse possession. This type of drifting along in the woods is certainly not unusual for this type of activity.
Prior to November 1963, when they purchased the 309 acre parcel there is no indication that they had, or thought they had, any possessory interests in either the 309 acre parcel or the 51 acre parcel. This is obvious because they purchased the 309 acre parcel from Eastern Connecticut Realty in that year, 1963. Prior to that time they may have been casual users of both properties, but certainly not under a claim of possession.
When they purchased the 309 acres in 1963, the statement of Leo Julian, now 80 years of age, claims that he thought it included the 51 acre parcel. The court does not credit that statement, for the deed to Michael is by metes and bounds with appropriate monuments and surveyor's angles. Other Julian witnesses do not support that statement of Leo Julian.
When the Julians sold the 309 acres to Pizza, Weingarten and Diviso in 1976-1980 there is no indication whatsoever that the sellers Julian sough to retain an easement for legal access to the 51 acre parcel. Had the Julians had any thought that they were in possession of the 51 acre parcel, by means of deed or otherwise, it is obvious that they would have provided for access to the 51 acre parcel by some reservation of right to pass over the 309 acre parcel, even if by the simple means of a small footpath easement. Failure to accomplish such reservation in the deed to the 309 acre parcel (exhibit J), or to offer any evidence on this subject, speaks strongly against their present claim of adverse possession to the 51 acre parcel. Further, when they sold the 309 acre parcel there is no indication that they sought, attempted or offered to pay any tax on, or inquired as to residual taxes on the 51 acre parcel, as modest as are those taxes of less than $200 per year. CT Page 10588
When Terra Alta, defendant, applied to the State of Connecticut to place much of its property into "Forest Land" per General Statutes §12-107d the map submitted therewith did not include the 51 acre parcel in dispute. Nor does the application make any reference to the 51 acre parcel (see Exhibit 24). See application, granted 9/23/87. No explanation is furnished as to any rational reason why the 51 acre tract would have been excluded if the defendants thought they possessed it by adverse possession or otherwise.
Mr. John Julian claims that he has posted signs on the south border of the 51 acre parcel. However, the signs which are demonstrated by photographs were posted during the title search, when he discovered a title problem with Mrs. Roman's chain of title. The court concludes that the signs are self serving, do not reflect adverse possession, and are not probative of the issues of this case. The court does not credit Mr. Julian's testimony that he placed no trespassing signs on this 51 acre parcel in the 1960's when he placed signs on the 309 acre parcel, which appears to be a matter of confusion of memory. John Julian further claims that he has asked outside hunters to leave the 51 acre property, which the court does not find to be probative. It is the nature of hunters and fishermen to "stake out" an attractive area, in the sportsman's use of that term, without regard to any concept of a legal possessory right to do so.
The court further notes that there is no evidence of a pathway, roadway or any other indication of consistent or frequent passage from the 309 acre piece onto the 51 acre piece, which contrasts to the worn path from Mrs. Roman's property on the east, leading into the 51 acre parcel. The unpaved road on the 309 acre piece stops well before the border with the 51 acre piece.
Lastly, the court notes that the proposed sale by the town to Mrs. Roman was published in the Notice of Special town Meeting on October 24, 1963. If any of the Julians believed at that time that they had acquired or were asserting a right to possession of this large a tract of land, 51 acres, by virtue of their now claim of hunting, berry picking and mushroom gathering, some protest by them would have been made at that duly noticed public meeting.
The deed from the Julians to Terra Alta, Inc. in November 1986 did not mention the 51 acre parcel. Terra Alta, Inc. cannot claim to be a successor or assignor of a claim of adverse possession of the Julians as individuals. Terra Alta, Inc. is a separate legal person. Nor can Terra Alta, Inc. claim that any of the Julians transferred any conceivable right in and to the separate 51 acre parcel. There are no documents submitted to that effect. CT Page 10589
It appears that if adverse possession is here claimed it would have to be that of John Julian, who claims to have used the 51 acre parcel since 1956. Here again the court notes that when the 309 acre parcel was conveyed to Terra Alta, Inc. no reservations was made in that transaction for an easement over the 309 acre piece for John Julian to gain access to the 51 acre piece. This is similar to the absence of reservation of an easement in the sale to total strangers Pizza, Weingarten and Diviso in 1976.
 Conclusion, and Order, as to Adverse Possession.
The court concludes that Terra Alta, Inc. has not proven its claim as concerns adverse possession of this 51 acre parcel. The court concludes that the defendant John J. Julian has not proven his claim of adverse possession of this 51 acre parcel.
The court concludes that the plaintiff Helen C. Roman has proven her claim of adverse possession by clear and convincing evidence. From the time the plaintiff first entered this property, under the ostensible auspices of the purported quit claim deed from the town of Ellington, she, and her husband acting on her behalf, took reasonable steps, consistent with the nature of this wooded rural property, to assert the plaintiff's claim to possession of the property. By such continuous activity the plaintiffs have ousted the record title holder, Mineral Springs Manufacturing Company, from possession of the land and have maintained such ouster for a period of greater than fifteen years without interruption by open, visible and exclusive possession, without license or consent of the owner, and under a claim of right. Ruich v. Twankins, supra, p. 155.
The fact that John Julian or others of his family members may have come upon the property occasionally for the purposes of hunting, gathering berries and mushrooms, without the knowledge or consent of the plaintiff, is immaterial to these considerations or to the conclusions of this court.
The argument of the defendants that other persons, the heirs of William Lee, the president of Mineral Springs Manufacturing Company may have been entitled to inherit his stock in the corporation is of no significance. The corporation has been ousted. Any argument that the heirs, in their own right, may be entitled to inherit the land is of no import. Under General Statutes § 52-575 they would be barred from making entry if they did not make entry within fifteen years of their acquisition of any such claimed title, which they did not do.
For many decades, prior to 1963, this property remained abandoned. The court, sua sponte, raised the question of escheat to the State of Connecticut. The court is satisfied that there is no automatic escheat in CT Page 10590 the State of Connecticut. See the excellent article on this subject, "Abandoned and Escheated Property", 64 Conn. Bar Journal, p. 289 (1990). The Attorney general has not commenced an action to accomplish escheat. See General Statutes § 3-36.
The court determines, under the provisions of General Statutes § 47-31, that this action to settle title is the proper manner to accomplish and to vest legal title in a party. " . . . the defendants had by adverse possession, acquired absolute title thereto." Lowenbey v.Wallace, 151 Conn. 355, 356 (1964). (emphasis added). Hence this judicial determination of adverse possession does not merely bar entry by specified persons or defendants, as would appear by a literal interpretation of General Statutes § 51-575, but in actuality does confer legal title upon the party proving adverse possession.
This court therefore determines that absolute legal title be and hereby vests in the plaintiff Helen C. Roman.
 Conclusions Conclusions and orders as to the purported deed and accompanyingaffidavits filed on the land record by the defendant.
General Statutes § 42-21 provides that the deeds of land by persons ousted of possession by one who has been ousted of possession is void.
The court determines that the purported deed from the heirs of William Lee, ostensibly acting for the corporation, Mineral Springs Manufacturing Company is void. The court therefore orders that this purported deed be released from the land records by the defendants, together with its accompanying documents, so as to prevent a cloud from being on the land records as concerns the plaintiff's title.
 The Defendants Claim of Easement by Prescription
The defendants claim an easement by prescription over the 51 acre parcel. General Statutes § 47-37 provides:
 "No person may acquire a right of way or any other easement from, in, upon or over the land of another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for fifteen years."
It is first noted that Terra Alta, Inc. cannot claim an easement by prescription as it has not even been in existence for a period of fifteen years. Nor is it claimed that John Julian, when hunting, gathering CT Page 10591 blueberries or mushrooms was doing so as an agent, servant, employee or acting on behalf of the corporation Terra Alta, Inc. Further, unlike most prescription disputes, it is not claimed nor may it be claimed that any such easement is for the use and behoof of adjacent land for the customary purposes of ingress and egress to and from adjacent property, or the like. This is not a claim of an easement appurtenant which serves the use of other land, but rather is a claim of an easement in gross which exists for the purposes, use and enjoyment of individuals without regard to ownership of other land. Hence the defendant Terra Alta, Inc. cannot claim an easement appurtenant by tacking on the use of its predecessors in title to the 309 acre parcel, so as to extend any claim of use beyond the period which it might claim to have used the 51 acre parcel.
The Julians claim to have used the 51 acre parcel for decades prior to their acquisition of the 309 acre parcel, and claim to have used the parcel during the years after they had sold the 309 acre parcel to unrelated third parties, Pizza, Weingarten, Diviso, belies any conceivable contention of an easement appurtenant.
The defendant John Julian claims to have used this 51 acre piece during each year since 1956. Any evidence that other of his relatives may have used the property prior thereto would be of no avail. His claim must derive from his own use and not the personal use of legal strangers, even if they are relatives. Those relatives would not have used the premises for him or at his behoof. Hence the use of others prior to his own use would be of no avail. As aforesaid, this is not a claim for an easement appurtenant to the 309 acre parcel, which they did not even possess until 1963.
John Julian's claim of use dates back to 1956, which would be an adequate period of time if the elements of prescription were to be demonstrated.
The recent case of Crandall v. Gould, clearly sets forth the principle here involved. "A party claiming to have acquired an easement by prescription must demonstrate that the use has been open, visible, continuous and uninterrupted for fifteen years and made under a claim of right." Crandall v. Gould, 244 Conn. 583, 590 (1998). Also, as with adverse possession "it is not necessary in order that the use be adverse that it be made under a claim that it is legally justified". Crandall v. Gould,
supra, p. 591.
However, "The use must have been so open, visible and apparent that it gave the owner of the servient land knowledge and full opportunity to assert his own right." Kleen v. DeRosa, 137 Conn. 586, 588 (1951); Aksmitas v.South End Realty Co., 136 Conn. 277, 281 (1949). CT Page 10592
More pointedly, " . . . there was no visible indication of the course or existence of the sewer across the premises, and that the defendant during the time he was the owner of the premises had no knowledge of the existence of the sewer beyond his own house, nor any claim of right or easement to maintain the same . . . It is for the party who seeks to establish an easement by user to exercise his claimed right so openly as to give the owner full knowledge and opportunity to assert his own right." Exley v.Gallivan, 96 Conn. 676, 679 (1921).
The court finds that the plaintiff had no knowledge whatsoever of the alleged use of the 51 acre parcel by the defendant John Julian, or by anyone coming on the property on his behoof. The plaintiff and her husband never saw Mr. Julian standing, walking, or being on the property. The only contact between the parties was on the other, the east, property of the plaintiff at the point where it abuts the 309 acre parcel. It was a friendly conversation which did not allude to the 51 acre parcel. There is no evidence that the defendant John Julian placed or left any indication, any object, or anything else which would indicate that he had been or was making use of or on the 51 acre parcel for any purpose. As aforesaid, there was no pathway or road or other indication that anyone was entering the 51 acres from the 309 acre parcel, or that John Julian was ever on the property.
The question is not whether one who comes upon wooded land of this nature is engaging in subterfuge or clandestine behavior. It is based upon the rational proposition that one may not gain a right to the land possessed by another under circumstances other than where the true possessor of the land has or should have knowledge of the intrusion and hence be able to assert and to protect his right to exclusive use of his property. Nor does the law require that the possessor of such property build mighty fences and fortifications so as to guard against every possible casual intrusion upon the land by unknown strangers. This is obviously particularly true as concerns wooded country land which is used by he possessor for recreational purposes.
The Court determines that the defendants have not proven a right of prescription to any use of the property.
It should be noted, in passing, that what the defendant may be seeking, by his claim for an easement by prescription, is in essence a non-exclusive profit in gross — the right to CT Page 10593 enter the property for the purpose of taking some of the products of the land. Deer, berries, mushrooms. (See Rosenblum v.Eisenhauer, 29 Conn. Sup. 216 (1971). If one assumes, arguendo, that the right to a "profit a prendre" can similarly be claimed by prescription or adverse possession, together with what would be an easement of necessity to effectuate the profit, yet the same criteria would apply to profit a prendre as would apply to a simple non-invasive easement. Because the defendant's claim of adverse possession, or easement by prescription, must fail, as set forth herein, so would any allied claim for a profit a prendre to take the products of the land.
As aforesaid, the court finds for the plaintiff on her action to quiet title, as set forth in the description contained herein, having proven her right to title by adverse possession. The court finds for the defendants on the remaining counts (second through seventh) of the complaint. The court finds for the plaintiff on each of the counterclaims and special defenses of the defendants.
Title vests in the plaintiff Helen Roman as concerns this property.
 "Bounded on the North by land of Eastern Conn. Realty Company; on the East by land now or formerly of the Estate of William E. Desso; on the South by the Ellington-Tolland Town Line, which is along land of the Connecticut Yankee Girl Scout Council, Incorporated; and on the West by land of the State of Connecticut
Containing Fifty-one (51) acres, more or less."
The court further determines that the "deed" from William D. Lee to the defendants, January 23, 1996 recorded in the Ellington Land Records March 28, 1996, Vol. 222, pp. 814-817 is null and void and orders that it and the affidavits filed therewith be released from the land records.
L. Paul Sullivan, J.
"EXHIBIT A"
 MANUSCRIPT VOL. 68 QUIT-CLAIM DEED
TO ALL PEOPLE TO WHOM THESE PRESENTS SHALL COME, GREETING: CT Page 10594
KNOW Ye, That It, the TOWN OF ELLINGTON, a municipal corporation having its territorial limits within the County of Tolland and State of Connecticut, acting herein by FRANCIS J. PRICHARD, JR., ROBERT E. FLUCKIGER, SR. and ROGER J. AUBREY, its Board of Selectmen, hereunto duly authorized, for the consideration of One and more dollars, being less that One Hundred (100) Dollars, received to its full satisfaction of HELEN C. ROMAN, of the Town of Stafford, County of Tolland and State of Connecticut, do remise, release, and forever QUIT-CLAIM unto the said HELEN C. ROMAN, her heirs and assigns forever, all the right, title, interest, claim and demand whatsoever as it the said releasor has or ought to have in or to a certain piece or parcel of land located in the town of Ellington, County of Tolland and State of Connecticut, more particularly bounded and described as follows, to wit:
Bounded on the North by land of Eastern Conn. Realty Company; on the East by land now or formerly of the Estate of William E. Desso; on the South by the Ellington-Tolland Town Line, which is along land of the Connecticut Yankee Girl Scout Council, Incorporated; and on the West by land of the State of Connecticut.
Containing Fifty-one (51) acres, more or less.
Said premises are subject to any and all provisions of any ordinance, municipal regulation, or public or private law.
TO HAVE AND TO HOLD the premises, with all the appurtenances, unto the said Releasee her heirs and assigns forever, so that neither it the Releasor nor its successors nor any other person under it or them shall hereafter have any claim, right or title in or to the premises, or any part thereof, but therefrom it is and they are by these presents forever barred and excluded.
IN WITNESS WHEREOF, the said TOWN OF ELLINGTON has caused its name to be signed, and its corporate seal to be affixed hereunto by the hand of its Board of Selectmen, above mentioned, this 18th day of December A.D., 1963.
 MANUSCRIPT VOL. 68
Signed, Sealed and Delivered in presence of TOWN OF ELLINGTON By CT Page 10595
 Mildred A. Dimock Francis J. Prichard, Jr. L.S. Edna T. Edwards Robert E. Fluckiger, Sr. L.S. Roger J. Aubrey L.S. its Board of Selectmen
STATE OF CONNECTICUT, ) (Town of Ellington Seal Affixed)) ss. Ellington December 18, A.D. 1963 County of Tolland )
Personally Appeared FRANCIS J. PRICHARD, JR., ROBERT E. FLUCKIGER, SR. and ROGER J. AUBREY, the Board of Selectmen of the Town of Ellington, as aforesaid Signers and Sealers of the foregoing Instrument, and acknowledged the same to be the free act and deed of said Town, in which name they executed the same, and their own free acts and deeds as such Selectmen, before me.
 Edna T. Edwards, Notary Public My Commission Expires April 1, 1964 Received for Record: (Notary Seal Affixed) December 30, 1963 at 9:03 A.M. Attest: _____________________________, Town Clerk
ROSENBLUM v. STATE OF CONNECTICUT, No. CV97 0056880 (Sep. 22, 1998) STEVEN ROSENBLUM VS. STATE OF CONNECTICUT 1998 Ct. Sup. ___ ___ CLR ___ No. CV97 0056880 Superior Court Judicial District of Ansonia/Milford at Milford September 22, 1998
 MEMORANDUM OF DECISION
COPPETO, J.
The plaintiff Steven Rosenblum, appeals the decision of the defendant Commissioner of Motor Vehicles suspending the plaintiff's motor vehicle license. The Commissioner acted pursuant to General Statutes § 14-227b on the basis that the plaintiff refused to submit to a chemical test of the alcohol content of his blood after having been arrested on a charge of driving while under the influence of alcohol.
The plaintiff contends that there is insufficient evidence in the record to support the hearing officer's determination that CT Page 10596 the plaintiff refused to submit to a chemical test of the alcohol content or his blood required by C.G.S. § 14-227 (b).
On October 31, 1996, the plaintiff was operating a motor vehicle on Route 34, in the town of Newtown, Connecticut when he was pulled over by Newtown Police Officer Christopher Vanghele who indicated he observed the plaintiff cross the center line of the highway several times. After the plaintiff failed the sobriety tests, Officer Vanghele placed the plaintiff under arrest and transported him to the Newtown Police Department Headquarters.
The plaintiff consented and agreed to take a breath test. At the Newtown Police Department, the breath test was administered to the plaintiff. In fact, two tests were administered to the plaintiff and both tests indicated insufficient air. At the hearing, Officer Vanghele testified "it appeared the plaintiff was trying. I heard the air . . . It seemed like he was filling up his lungs but the machine was still putting out insufficient breath" (R. 3, p. 8). Officer Vanghele, who is not certified on the machine, the Intoxilyzer 5000, believed the machine may have been faulty or needing repairs. (R. 3, p. 8).
The plaintiff was then transported to the Southbury Police Barracks to perform the Breathalyzer test on the machine at that location.
A single test was given at the Southbury Barracks. (R. 3, p. 12) at which Officer Vanghele was present. The machine indicated insufficient breath.
At the Administrative hearing in the present case, the hearing officer admitted into evidence, without objection from the plaintiff the written report of the State Police Trooper, Officer Grieder, who conducted the testing procedures at the Southbury Barracks. The device was certified and checked for accuracy and Officer Grieder is a certified operator.
In his report, the Trooper indicates he explained the procedure to the plaintiff and that the plaintiff stated he already knew what to do. When the plaintiff blew into the intoxilyzer he noticeably let air escape over the mouthpiece which conduct was observed by Officer Grieder. Officer Vonghele, who was present also heard the air escaping from the mouthpiece (R. 3., p. 15). CT Page 10597
Unlike the circumstances in the case of Bialowas v.Commissioner, 44 Conn. App. 702, where the only evidence was repeated inadequate breath samples, the police officers' in this case noted specific actions on the part or the plaintiff, that is, that he allowed air to escape and did not adjust his attempts as requested by Officer Grieder. In this case, the issue is whether the hearing officer could weight these facts, as well as plaintiff's contrary testimony and arrive at a finding of refusal due to non-cooperation. This issue must be resolved in accordance with well settled principles of administrative law.
A basic principle of administrative law is that the scope of this court's review of an agency's decision is very limited. This court cannot substitute its judgment for that of the agency as to the weight of the evidence or questions of fact. The reviewing court cannot try the case de novo. The plaintiff has the burden to establish that substantial evidence does not exist in the record as a whole to support the agency's decision.
The reviewing court must take into account the contradictory evidence in the record.
The plaintiff agreed to take a breath test. However, he failed to cooperate by allowing air to escape from around the mouthpiece. A failure to cooperate can be taken as a refusal. Although there was contradictory evidence in the record, this does not prevent the hearing officer from drawing a conclusion based on qualitatively substantial evidence that the plaintiff intentionally allowed air to escape and thus his non-cooperation was a refusal to take the breath test.
The statutory provisions would have no meaning if one could agree to take a breath test, fail to cooperate in its administration and then claim that there was no refusal to take the test.
This court may not retry the case or substitute its own judgment for that of the hearing officer.
The administrative record demonstrates a reasonable and sufficient basis of fact from which the hearing officer could determine a refusal, in that the plaintiff allowed air to escape from around the mouthpiece, which resulted in insufficient air going into the machine, as observed by the officer. CT Page 10598
The plaintiff was arrested on October 31, 1996. The administrative hearing was scheduled for November 21, 1996.
Because the hearing officer had a conflict of interest, the motor vehicle department continued the hearing to December 4, 1996. A hearing was held on December 4, 1996 but because two police officers subpoenaed by the plaintiff failed to appear, the hearing was continued to December 18, 1996. The hearing officer rendered his decision on December 19, 1996 which was in excess of 45 days of the plaintiff's arrest. The hearing officer made it clear to the plaintiff that in order to continue the hearing from December 4, 1996 to December 18, 1996 to accommodate the plaintiff, the plaintiff would have to waive his right for a decision to be filed within the statutory time period. The hearing officer continued the hearing to December 18, 1996 based on the plaintiff's acquiescence and waiver of the statutory requirement.
There was sufficient evidence on the record before the hearing officer to determine that the statutory dictates of §14-227b were complied with by the arresting officer. The plaintiff was not prejudiced by the police officer's failure to insert the proper expiration date on the temporary operator's license. A revised suspension notice was sent to the plaintiff on November 22, 1996 indicating the effective date of the suspension as December 15, 1996.
The hearing was limited to, and appropriately so, a determination of the four issues stated in § 14-227b(f). The hearing officer determined after a hearing that the essential elements of the statute, § 14-227b, had been proven and suspended the plaintiff's operator's license.
For all of the above, the appeal is dismissed.
Coppeto, J.